# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF MICHIGAN ex rel. MAHMOUD EL-YASSIR, M.D., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No.  3:19-cv-11436 |
| NOSSONAL KLEINFELDT, M.D.; COBURN KLEINFELDT EYE CLINIC PLLC d/b/a MICHIGAN OPHTHALMOLOGY CONSULTANTS d/b/a OPHTHALMIC SPECIALISTS OF MICHIGAN; RIDGEMONT PARTNERS MANAGEMENT LLC; RIDGEMONT EQUITY PARTNERS II LP; RIDGEMONT EQUITY MANAGEMENT II LP; RIDGEMONT EQUITY MANAGEMENT II LLC;  and JOHN AND JANE DOES 1-100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Robert H. Cleland  **FILED UNDER SEAL DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |
| Jointly and Severally, | ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. § 3729 *et seq.*) AND MICHIGAN MEDICAID FALSE CLAIMS ACT (M.C.L. § 400.601 *et seq.*)

## <u>TRIAL BY JURY REQUESTED</u>

Pursuant to 31 U.S.C. § 3730(b)(1) and M.C.L. § 400.610a(1), Relator

Mahmoud El-Yassir, M.D. ("Relator"), on behalf of the United States of America

and the State of Michigan, by his attorneys, James Hoyer, P.A., brings this civil

action under the federal False Claims Act ("FCA") and the Michigan Medicaid

False Claims Act ("MMFCA").

## **INTRODUCTION**

This case involves the submission of false or fraudulent claims for services

to Medicare and Medicaid, and based on information on belief, Tricare as well, by

ophthalmologist Nossonal "Nate" Kleinfeldt, M.D. ("Dr. Kleinfeldt"), Coburn

Kleinfeldt Eye Clinic PLLC d/b/a Michigan Ophthalmology Consultants d/b/a

Ophthalmic Specialists of Michigan ("OSM"), and Ridgemont Partners

Management LLC, Ridgemont Equity Partners II LP, Ridgemont Equity

Management II LP, and Ridgemont Equity Management II LLC (collectively,

"Defendants").  Specifically, Relator alleges that Defendants knowingly made

false statements and knowingly submitted or caused the submission of false

claims to Medicare, Michigan Medicaid, and Tricare for ophthalmologic services

that were excessive, not medically necessary, and/or inadequately documented,

and/or not actually performed.  Additionally, Relator alleges that Defendants have

systematically paid illegal kickbacks to optometrists in exchange for referrals.

Lastly, Relator alleges that Defendants have identified numerous overpayments

from Medicare, Medicaid, and Tricare and failed to timely disclose and/or return those payments.

For a period of several years, Defendants engaged in a pattern and practice of falsely diagnosing patients with glaucoma and performing hundreds, if not thousands, of medically unnecessary surgical procedures.  Additionally, in patients that did actually suffer from glaucoma, Defendants deviated from the standard of care and forwent recommended periods of observation and pharmacologic therapy in favor of immediate and often medically unnecessary surgical procedures which resulted in much higher payments to Defendants from government and private health insurers.

To support their claims for this fraudulent conduct, Relator alleges as follows:

## JURISDICTION AND VENUE

1.     This action arises under 31 U.S.C. § 3729 *et seq*., also known as the False Claims Act, and the Michigan Medicaid False Claims Act, M.C.L. § 400.601 *et seq.*, to recover treble damages and civil penalties on behalf of the United States of America and state of Michigan arising out of Defendants' violations of the FCA and MMFCA.

2.     Under § 3732 of the FCA, this Court has jurisdiction over actions brought under the FCA.  Furthermore, jurisdiction over this action is conferred on

this Court by 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

3.     This Court has supplemental jurisdiction over all other claims set forth in this Complaint because these claims are so related to the claims arising under the FCA that they form part of the same case or controversy.  28 U.S.C. § 1367.

4.     Venue is proper in this district pursuant to § 3732(a) of the FCA, which provides that "any action under § 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred."  At all times material hereto, Defendants regularly conducted business within the State of Michigan, and maintained permanent employees and offices in the State of Michigan, within this judicial district.  Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## FILING UNDER SEAL

5.     Under the FCA, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.  The United States Government and/or the State of Michigan may elect to intervene and proceed with the action within sixty (60) days after the government receives the Complaint.

6.     As required by both False Claims Acts, Relator is an original source of the information contained herein and has disclosed substantially all material evidence and information in his possession to the United States Attorney General and the Michigan Attorney General following the filing of the Complaint in this action, and cooperated with the Government in its investigation of these allegations.

## PARTIES

7.     Relator Mahmoud El-Yassir, M.D., resides in the Eastern District of Michigan.

8.     Relator is a licensed ophthalmologist specializing in the treatment of cataracts and glaucoma.  He is pending admission to the American Board of Ophthalmology.

9.     OSM employed Relator as an ophthalmologist from July 18, 2016 until his resignation on August 3, 2018.

10.   Dr. Kleinfeldt is an ophthalmologist and owner of Coburn Kleinfeldt Eye Clinic PLLC d/b/a Michigan Ophthalmology Consultants d/b/a Ophthalmic Specialists of Michigan.

11.   Dr. Kleinfeldt's NPI is 1376540369.  He has been licensed to practice medicine in the state of Michigan since 2001, and his medical license number is 4301072297.

12.   Dr. Kleinfeldt altered medical records, performed unnecessary surgeries, upcoded, billed for services not rendered, and devised and directed an unlawful referral scheme.

13.   Defendant OSM was founded in 1977 by the deceased Ronald Murray Coburn, M.D. ("Dr. Coburn") as Ronald M. Coburn, M.D., P.C.

14.   Dr. Coburn died on May 5, 2015 at the age of 71

15.   OSM hired Dr. Kleinfeldt in or about 2002, following the completion of his ophthalmic residency at the Kresge Eye Institute.

16.   In or about May 2004, Dr. Kleinfeldt obtained an interest in OSM, at which point OSM changed its legal name from Ronald M. Coburn, M.D., P.C. to Kleinfeldt Eye Clinic, P.C.

17.   On July 22, 2014, OSM registered its current assumed name, Ophthalmic Specialists of Michigan, as well as Michigan Ophthalmology Consultants.

18.   OSM operates three locations: 24800 Michigan Ave., Dearborn, Michigan 48124; 33400 W. 6 Mile Road, Suite B, Livonia, Michigan 48152; and 301 W. 13 Mile Road, Madison Heights, MI 48071.  OSM's main office is in its Livonia location.

19.   Defendant Ridgemont Equity Partners II LP, is a Delaware entity that owns a significant, and likely controlling, interest in OSM.  Ridgemont Equity

Partners II LP is owned and/or controlled by Ridgemont Partners Management LLC, Ridgemont Equity Management II LP, and Ridgemont Equity Management II LLC (referred to collectively as the "Ridgemont Defendants").  The Ridgemont Defendants placed Greg Nodland as CEO of OSM as a condition of Ridgemont's investment in OSM.

20.   John and Jane Does 1-100 are individual optometrists and other medical providers who referred patients to OSM in exchange for kickbacks.

## MEDICARE PROGRAM

21.   Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395kkk-1, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as Medicare.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 1395 *et seq.*

22.   Medicare is comprised of Parts A, B, C, and D.  Part B is medical insurance that authorizes payment of federal funds for health services, including physician, laboratory, outpatient, diagnostic, and radiology services.  *See* 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

23.   The Secretary of the United States Department of Health and Human Services ("HHS") has overall responsibility for the administration of Medicare.  Within HHS, the responsibility for the administration of Medicare has been delegated to the Centers for Medicare and Medicaid Services ("CMS").

24.   To assist in the administration of Medicare Part B, CMS initially contracted with "carriers" or "fiscal intermediaries."  Carriers, typically private insurance companies, were largely responsible for processing and paying Part B claims. 42 C.F.R. §§ 421.1–421.3.

25.   Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing carriers and fiscal intermediaries.  *See* 42 U.S.C. § 1395kk-1; 42 C.F.R. § 421.400 et seq.; 71 F.R. 67960-01, at 68181 (Nov. 24, 2006).  MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level.

26.   Wisconsin Physicians Service Insurance Corporation has served as the MAC for Michigan since 2011.

27.   CMS also contracts with Unified Program Integrity Contractors ("UPICs"), which are responsible for maintaining the integrity of the Medicare program in specific regions, including through audits and pre- and post-payment reviews.  Michigan is in the Midwestern region, and its UPIC is AdvanceMed, a division of NCI, Inc.  *See* 42 C.F.R. § 421.300 et seq.

28.   Medicare pays only for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A); *see also* id. § 1320c-5(a)(l) (Medicare providers must assure that their services are rendered

"economically and only when, and to the extent, medically necessary"); § 1320c-5(a)(2) (Medicare providers must assure that their services are "of a quality which meets professionally recognized standards of health care").

29. Part B providers present claims to Medicare on the CMS Form 1500 Health Insurance Claim Form, where providers certify, *inter alia*, that their services were medically necessary.

30. Part B providers make additional certifications to the federal government in provider enrollment agreements on CMS Form 855b (Medicare Enrollment Application for clinics/group practices and certain other suppliers) and/or CMS Form 855i (Medicare Enrollment Application for physicians and certain non-physician practitioners), including:

> I agree to abide by the Medicare laws, regulations and program instructions . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

> \* \* \*

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

31.  Relying on the veracity of these certifications, CMS makes Medicare payments retrospectively (i.e., after the services are rendered) to Part B providers. For this reason, Medicare payments are often referred to as reimbursements.

32.  Defendants Dr. Kleinfeldt, OSM, and John and Jane Does have been registered as Medicare providers in Michigan during all times relevant to this case, and each of the forenamed has executed at least one provider enrollment agreement.

33.  In addition to traditional fee-for-service Medicare, CMS also allows beneficiaries to elect coverage through private insurers in a program called Medicare Advantage.

34.  Insurers providing Medicare Advantage coverage are known as Medicare Advantage Organizations ("MAOs").

35.  MAOs are funded by CMS using a capitation rate.

36.  MAOs process and reimburse claims from healthcare providers.

37.  In 2009, the Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, 123 Stat. 1617, amended the FCA to prohibit not only false claims submitted directly to the federal government, but also claims submitted to government contractors and grantees, including MAOs and other Medicare contractors.

## MEDICARE CLAIM SUBMISSION AND PAYMENT PROCESS

38.   As Medicare providers, Defendants were obligated to understand and certify their compliance with all applicable Medicare laws, regulations, and program instructions as a condition of participation in Part B and as a condition of payment of Medicare reimbursements.  *See ¶* 30, *supra.*

39.   Medicare providers like Defendants are reimbursed for covered services based on their submission of an electronic or hard-copy claim form called the CMS Form 1500 Health Insurance Claim Form.

40.   When submitting claims to Medicare, providers certify on CMS Form 1500, *inter alia*, that (a) the services rendered are "medically indicated and necessary for the health of the patient;" (b) the information on the claim form is "true, accurate and complete;" and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws."  After a February 2012 revision to CMS Form 1500, providers further expressly certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment . . . ."

41.   CMS Form 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any

misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

42.   Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

43.   Generally, once a provider submits CMS Form 1500 to Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

44.   Exceptions to this general procedure include pre- and post-payment reviews, which can be initiated by MACs and UPICs to address suspect billing practices.  In pre-payment review, some or all of a provider's claims undergo medical review before payment is authorized.  Medical review involves the collection and evaluation by a medical professional of the medical records associated with each claim.  In post-payment review, a sample of paid claims is subjected to medical review to establish whether an underpayment or overpayment occurred in the universe of claims.

## MEDICAID PROGRAM

45.   Medicaid was established by Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396-1396v.  Medicaid is a jointly-funded federal-state program and enables states such as Michigan to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical services.

46.   Although Medicaid is funded in significant part by the States, the federal government pays a portion of Medicaid costs.  In Michigan, the federal government pays for approximately 56 percent of all Medicaid health care serves, while the State of Michigan funds the remaining 44 percent.  Accordingly, all claims or requests for payments submitted to the Medicaid program are subject to liability under both the federal FCA and the Michigan False Claims Act.

47.   All providers who submit claims to the Michigan Medicaid program are required to honor the terms and conditions of the Michigan Medicaid Provider Manual, in accordance with the terms of their Enrollment Agreement.

48.   In other words, compliance with the terms of the Michigan Medicaid Provider Manual is required in order to properly bill and be paid for services.

49.   Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all Medicaid requirements, including the fraud and abuse provisions.

50.   Michigan Medicaid does not pay for medically unnecessary or upcoded services, or for services that are not actually provided.

## CONCEALMENT AND FAILURE TO RETURN MEDICARE AND/OR MEDICAID OVERPAYMENTS

51.   The Patient Protection and Affordable Care Act ("PPACA") Section 6402, Enhanced Medicare and Medicaid Program Integrity Provisions, amended Part A of Title XI of the Social Security Act (42 U.S.C. § 1301 et seq.).

52.   Section 6402(d) of PPACA provides:

(d) Reporting and Returning of Overpayments –

(1) IN GENERAL – If a person has received an overpayment, the person shall –

(A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and

(B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

(2) DEADLINE FOR REPORTING AND RETURNING OVERPAYMENTS - An overpayment must be reported and returned under paragraph (1) by the later of –

(A) the date which is 60 days after the date on which the overpayment was identified; or

(B) the date any corresponding cost report is due, if applicable.

(3) "ENFORCEMENT" -Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of

title 31, United States Code) for purposes of section 3729 of such title.
(4) DEFINITIONS - In this subsection:

(5) KNOWING AND KNOWINGLY - The terms 'knowing' and 'knowingly' have the meaning given those in section 3 729(b) of title 31, United States Code.

(6) OVERPAYMENT-The term 'overpayment' means any funds that a person received or retains under title XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such title.

53.   The False Claims Act, 31 U.S.C. §3729(a)(l)(G) provides that "any person who - knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or properly to the Government is liable to the Government Entities for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. §2461 note; Public Law 104-410), plus 3 times the amount."

## GLAUCOMA

54.   The term glaucoma refers to a collection of diseases characterized by distinctive changes in the visual field and in the cup of the optic nerve, resulting in the loss of peripheral vision.

55.   The most common form of glaucoma is primary open-angle glaucoma ("POAG").  POAG is characterized by a gradual build-up of pressure in the posterior chamber of the eye caused by an impairment of the outflow of aqueous humor (ocular fluid) through the trabecular meshwork between the anterior and posterior chambers of the eye.  Trapped aqueous humor increases the pressure in the posterior chamber to levels that can damage the optic nerve.

56.   The term "open-angle" refers to the angle of the intersection of the cornea and iris.  The angle is evaluated through a process called gonioscopy, in which a special contact lens prism is placed on the surface of the eye, allowing the visualization of the angle and drainage system inside the eye.

57.   POAG is treated with a variety of methods that either decrease the production of aqueous humor or increase its outflow from the posterior chamber to the anterior chamber of the eye.

58.   Other, less common types of glaucoma include acute or closed-angle glaucoma, which is an ophthalmologic emergency requiring immediate treatment, as well as low and normal-tension glaucoma.  Low and normal-tension glaucoma occurs in eyes at normal or low levels of intra-ocular pressure.

59.   The ocular nerve damage associated with glaucoma is known as "cupping."  The neural rim of the nerve is destroyed and the central cup of the nerve becomes enlarged and excavated.

60.   Cupping of the ocular nerve is visible during a physical exam through the use of an ophthalmoscope.

61.   In addition to the telltale loss of peripheral vision detected via a visual field test, testing for glaucoma should include measurements of the cup-to-optic disc ratio ("CDR") and intraocular pressure ("IOP").

62.   CDR ranges widely in normal individuals, and glaucoma is difficult to reliably diagnose simply by observing a large or deep optic cup.  Rather, serial examinations should be used to determine if the CDR is stable or relentlessly expanding, as is the case in a patient with glaucoma.

63.   IOP is measured using an instrument called a tonometer.  IOP is generally measured using millimeters of mercury, abbreviated mmHg.

64.   An IOP of 20 mmHg is considered normal, and an IOP of 21 mmHg or above may indicate the presence of POAG when accompanied by other symptoms.

65.   There are several methods of tonometry ranging from Goldmann tonometry, which uses a small prism that is pushed against the eye to flatten a small area of the cornea, to non-contact or air-puff tonometry.

66.   Goldmann tonometry is considered the "gold standard" of tonometry by the American Academy of Ophthalmology and used is used by OSM.  *See, e.g.,* Goldmann Tonometer Remains Gold Standard for Measuring IOP,

AMERICAN ACADEMY OF OPHTHALMOLOGY (NOV. 13, 2017),

https://www.aao.org/eyenet/academy-live/detail/goldmann-tonometer-remains-

gold-standard-iop# (a publication of the American Academy of Ophthalmology).

67. Despite being the "gold standard," Goldmann tonometry is not

without its flaws. The results of Goldmann tonometry are influenced by the

corneal thickness, calibration of the instrument, and the users themselves.

68. Goldmann tonometry does not report the actual IOP, but rather an

estimate thereof.

69. An IOP of greater than 20 mmHg measured by a Goldman tonometer

is not by itself necessarily indicative of POAG. A diagnosis of glaucoma should

be reached only after examining the patient's visual field and CDR as well.

70. When initiating therapy for POAG, it is assumed that elevated IOP

contributed to optic nerve damage and is likely to cause additional damage in the

future.

71. IOP may be lowered with medical therapy, laser therapy, or incisional

glaucoma surgery.

72. According to the American Academy of Ophthalmology, treatment

with medicine is generally considered the first line of treatment for POAG, unless

the patient the patient is at high risk for nonadherence to medical therapy and

those who cannot or will not use medications reliably due to cost, memory

problems, difficulty with instillation, or intolerance to the medication. *See* Bruce E. Prum Jr., M.D., et al., Primary Open-Angle Glaucoma Preferred Practice Pattern® Guidelines, AMERICAN ACADEMY OF OPHTHALMOLOGY JOURNAL, Vol. 123, Issue 1, P68 (Jan. 2016), *available at* https://www.aaojournal.org/article/S0161-6420(15)01276-2/pdf.

73.   If medical treatment to lower a patient's IOP is ineffective or infeasible, several alternative treatments are available.  Common treatments include selective laser trabeculoplasty ("SLT") and argon laser trabeculoplasty ("ALT").

74.   In some cases, surgical procedures such as tube shunt surgery and trabeculectomy may be necessary.

75.   Less commonly used treatments are endoscopic cyclophotocoagulation ("ECP") and transscleral cyclophotocoagulation ("TSCPC"), which use lasers.  ECP and TSCPC are used on patients with high IOP not that is unable to be controlled with maximal medical therapy, consisting of four different topical eye drops.

76.   ECP and TSCPC are reserved for eyes with poor visual potential (eyes with poor vision) due to their long side effects profile.

## **RELATOR'S EMPLOYMENT WITH OSM**

77.   Relator began working for OSM on July 18, 2016.

78.   In May 2016, Relator went to OSM's Livonia office for training on the electronic medical record ("EMR") system used to maintain patient records, as well as for general onboarding and initial training.

79.   During Relator's May 2016 visit to OSM, he shadowed Dr. Kleinfeldt for half the day.  Relator saw Dr. Kleinfeldt rushing from patient to patient, improperly performing exams and skipping essential steps required to assess the ocular health of patients and diagnose any possible diseases.

80.   During one patient encounter, Relator observed Dr. Kleinfeldt performing gonioscopy.

81.   Gonioscopy generally takes about two minutes per eye.  First, numbing gel eye drops are used to couple a special prism lens to the eye.  Next, the doctor rotates the device to examine the angle of the iris and cornea and the eye's drainage system.

82.   Relator became concerned when Dr. Kleinfeldt examined both eyes in a matter of seconds, not the two-plus minutes that the procedure generally requires per eye.

83.   While observing Dr. Kleinfeldt, Relator never saw Dr. Kleinfeldt apply the prerequisite numbing drops.

84. Further, Dr. Kleinfeldt did not touch the corneal surface or couple the lens of the device to the eye, rendering it impossible to view the internal structures of the patient's eyes.

85. During another exam with a new patient, Relator noticed that Dr. Kleinfeldt failed to perform ophthalmoscopy (also known as funduscopy), a fundamental and essential eye exam procedure that allows a doctor to see the fundus and other structures in the eye.

86. Ophthalmoscopy allows a doctor to view the optic cup and observe the optic cupping that is indicative of glaucoma.

87. Relator asked Dr. Kleinfeldt why he did not perform ophthalmoscopy. Dr. Kleinfeldt responded to the effect, "Oh, you'll see. You don't need that."

88. OSM assigned Relator to work in its Madison Heights office.

89. In or about September 2016, Dr. Kleinfeldt missed work for a day due to an emergency.  Then CEO, Kristen Davis ("Ms. Davis") called Relator and asked him to cover Dr. Kleinfeldt's office visits for the day.

90. Relator reviewed Dr. Kleinfeldt's schedule for the day in question and saw that Dr. Kleinfeldt was scheduled to see more than 150 patients.

91. OSM is open from 8 AM to 4:30 PM, or 510 minutes, per day.

92. A schedule of 150 patients means that Dr. Kleinfeldt would have to see a patient every 3.4 minutes without taking any breaks, an impossibility if he

is to actually perform the services for which he bills Medicare, Medicaid, Tricare, and other insurers.

93.   Relator asked Ms. Davis to cancel all of the new patients because they are the most time intensive.  Ms. Davis agreed, and Relator was scheduled to see approximately 95 remaining patients for Dr. Kleinfeldt.

94.   Relator worked as fast as he could, skipping lunch and all breaks, and struggled to keep up with 95 patients.

95.   To see 150 patients in a day is simply not possible if one is to perform even a fraction of the services that are required.

96.   Relator saw Dr. Kleinfeldt's office appointment schedule on many other occasions.

97.   Dr. Kleinfeldt was routinely scheduled to see 170 to 190 patients in a day, or a patient every 2.7 to 3 minutes.

98.   A review of Medicare claims data from CMS indicates that Dr. Kleinfeldt bills for services that either he did not perform or that he is systematically engaging in the illegal fraudulent practice of "upcoding" by submitting claims for more costly and time consuming services than he actually performed.

99.   According to the Medicare Physician and Other Supplier Data CY 2016 published by CMS, in 2016, Dr. Kleinfeldt billed Medicare for the following services:

| HCPCS CODE | HCPCS DESCRIPTION | SERVICES BILLED | AVERAGE MEDICARE PAYMENT |
|---|---|---|---|
| 99203 | New patient office or other outpatient visit, typically 30 minutes | 25 | $61.98 |
| 99204 | New patient office or other outpatient visit, typically 45 minutes | 516 | $119.67 |
| 99213 | Established patient office or other outpatient visit, typically 15 minutes | 619 | $63.98 |
| 99215 | Established patient office or other outpatient, visit typically 40 minutes | 100 | $102.25 |

100. In the year 2016, Dr. Kleinfeldt billed for more new patient visits with code 99204 than 99% of ophthalmologists nationwide.

101. Indeed, he billed for more of these services than any other ophthalmologist in the state of Michigan, with the next closest doctor billing for only 373 services compared to Dr. Kleinfeldt's 516 services.

102. CMS Data for 2015 and prior years is similar, with Dr. Kleinfeldt billing for numerous time consuming services, despite spending an average of only 2.7 to 3 minutes per patient on his non-surgical days.

103. On Thursdays, Dr. Kleinfeldt performs surgeries in OSM's Livonia outpatient surgery center.  He performs an average of 50 to 60 procedures per day, far more than anyone else at OSM.

104. The two procedures performed most frequently by Dr. Kleinfeldt are the removal of cataracts and laser surgery to treat POAG.

105. Relator witnessed Dr. Kleinfeldt frequently performing procedures, particularly laser treatments for POAG, in remarkably little time.

106. Dr. Kleinfeldt took far less time to perform laser treatments related to POAG than anyone else at OSM.  He rushed through ECP and SLT, taking only a few seconds instead of minutes, and performing the procedures without precision or accuracy.

107. Dr. Kleinfeldt's rushed surgical procedures result in numerous complications, which are often corrected by other ophthalmologists in the practice, including Relator.

108. While other ophthalmologists in the office generally experienced only zero to three complications per year, Dr. Kleinfeldt's complication rate was closer to 40 to 60 complications per year.

109. On at least two occasions, Dr. Kleinfeldt operated on the wrong eye.

110. On multiple occasions, Dr. Kleinfeldt and OSM's management pressured Relator to perform more laser treatments for POAG, despite the fact that drops and other medications are the front line treatment.

111. Indeed, the standard practice of using medicine as the front line treatment for glaucoma was acknowledged by Dr. Kleinfeldt in a text message to

Relator on March 1, 2018 at 2:52 PM.  Dr. Kleinfeldt wrote, "I've started doing SLTs and TSCPs for Pts who can't get their dorzolamide with the back order…"

112. Dorzolamide, sold as Trusopt, is an eye drop commonly used to reduce IOP.

113. Relator resisted the pressure to perform procedures which he saw as medically unnecessary for the majority of his patients.

114. OSM maintains its high volume of patients in large part because of a network of referring optometrists.

115. Twice per year, OSM hosts free continuing education events for optometrists and other medical professionals.

116. During the continuing education events, ophthalmologists from OSM present on a variety of topics, taking into account specific subjects requested by top referring optometry practices.

117. Dr. Kleinfeldt frequently shows videos which he claims are of him performing various complex surgical procedures.

118. However, the videos often show tools that OSM does not use or possess, and procedures that Relator never saw Dr. Kleinfeldt perform during his more than two years of employment at OSM.

119. Dr. Kleinfeldt emphasizes his role as a cataract specialist during the continuing education events.

120. Dr. Kleinfeldt frequently boasts at the events that he has not experienced a complication in 15 years of practice, prompting the optometrists in the audience to have a false opinion of Dr. Kleinfeldt's competency.

121. In an effort to improve its marketing, OSM closely tracks the source of all patients in its EMR system, MDOffice.

122. OSM classifies the top referring optometrists into three tiers.

123. On various occasions such as birthdays and Christmas, OSM distributes gift cards worth $100 to $300 to the top referrers.  The amount varies by tier.

124. During Relator's employment, the gift cards were purchased and distributed first by Marketing Director Roshelle Brockman ("Ms. Brockman"), and later by her replacement Rachel Wojciechowski ("Ms. Wojciechowski").

125. OSM reminded optometrists about the gift card program during continuing education events with the intent of influencing the optometrists' decision on where to refer patients.

126. In addition to providing gift cards, Dr. Kleinfeldt compensates optometrists for their referrals for cataract surgery by offering to engage in the practice of "co-management."

127. Co-management involves the delegation of post-operative care from an ophthalmologist to an optometrist.

128. According to CMS, the arrangement must be in writing and is reflected in medical billing by using the modifiers 54 (surgical) and 55 (post-operative care).

129. Reimbursement for the optometrist is valued at 20% of the global surgical fee.

130. In 2018, CMS paid approximately $665 for HCPCS 66894 for the "Removal of cataract with insertion of lens," the procedure associated with co-management.  At this rate, a co-management agreement is worth $133 per procedure to an optometrist.

131. CMS requires an optometrist engaging in co-management to actually perform post-operative services.

132. However, Dr. Kleinfeldt offered this this arrangement to optometrists, telling them that they would not have to do anything.

133. In 2014, and 2015, Dr. Kleinfeldt offered such an arrangement to Ali Fakih, O.D. ("Dr. Fakih"), a local optometrist.

134. Dr. Kleinfeldt told Dr. Fakih that he all he would have to do is refer patients for cataract surgery in order to be paid.

135. Dr. Fakih declined the arrangement and stopped referring patients to OSM.

136. Dr. Fakih is friends with Relator, and expressed concerns about Dr. Kleinfeldt to Relator.

137. Dr. Fakih's chief concern was that Dr. Kleinfeldt performed unnecessary cataract surgery on Dr. Fakih's father, Haider Fakih ("Mr. Fakih").

138. Mr. Fakih saw Dr. Kleinfeldt for eye care while his son, Dr. Fakih, was out of the country.  The care was for conditions unrelated to cataracts.

139. When Dr. Fakih returned to the U.S., he learned that Dr. Kleinfeldt performed cataract surgery on Mr. Fakih in both eyes, despite Mr. Fakih presenting no symptoms and making no complaints consistent with cataracts.

140. Mr. Fakih reported to Dr. Fakih that Dr. Kleinfeldt pressured him to operate immediately, stressing that time was of the essence if he wanted to preserve his vision.

141. In 2017, OSM entered into negotiations with business broker Brentwood Capital Advisors to sell a controlling interest in OSM to the Ridgemont Defendants.

142. In late 2017, OSM offered Relator $400,000 plus additional profit sharing incentives as a retention bonus in exchange for remaining with OSM for a minimum of three years following the equity sale.

143. Relator, tired of growing pressure to perform unnecessary procedures and concerned about Dr. Kleinfeldt's fraudulent practices, declined the offer and resigned.

144. Relator's last day at OSM was August 3, 2018.

145. Dr. Kleinfeldt agreed to sell a controlling interest in OSM to the Ridgemont Defendants in the fall or winter of 2018.

146. As part of the deal, Ridgemont installed a new CEO, Greg Nodland ("Mr. Nodland").

147. Mr. Nodland started at OSM in approximately September or October 2018.

148. Mr. Nodland is an agent of the Ridgemont Defendants.

149. Relator stayed in touch with his former co-workers at OSM following his resignation.

150. In January 2019, Relator was informed by Ms. Wojciechowski that two technicians at OSM complained to Mr. Nodland that Dr. Kleinfeldt was altering the results of the tonometry tests that they performed.

151. The technicians reported that Dr. Kleinfeldt routinely inflated IOP readings from the normal range of <20 mmHg to readings that would suggest a diagnosis of POAG.

152. The technicians expressed concern that Dr. Kleinfeldt was using the fraudulently inflated IOP to justify performing unnecessary procedures to treat non-existent POAG during planned cataract surgeries.

153. Mr. Nodland worked with Human Resources Manager Maria Loria ("Ms. Loria") to investigate the complaint.

154. Ms. Loria helps maintain the MDOffice EMR system and performs other IT and operations duties as well.

155. Together, Ms. Loria and Mr. Nodland conducted an audit of the MDOffice system and identified approximately 20,000 IOP measurements that appear to have been altered in the EMR by Dr. Kleinfeldt.

156. Relator has since spoken with Dr. Shareef Ahmed, another ophthalmologist employed by OSM, who confirmed the report that Dr. Kleinfeldt was caught altering IOP readings, as well as the findings of the internal audit.

157. To date, Relator is unaware of OSM making any effort to disclose to CMS the likely hundreds or thousands of medically unnecessary procedures that Dr. Kleinfeldt has performed.

158. Dr. Kleinfeldt's fraud subsequently motivated at least one employee, Ms. Wojciechowski, to resign from OSM.

159. In the time since learning more about Dr. Kleinfeldt's improprieties, Relator has discovered several patient complaints relating to unnecessary

procedures hosted on the website Vitals.com.  Some of those patient complaints

are excerpted below.

⭐☆☆☆☆ WATCH YOUR PEEPERS

Self-verified patient of Dr. Nossonal Kleinfeldt - Posted on February 11th, 2019

I was a victim as well, I was told I had cataract and glaucoma that I would go blind without the surgery I trusted this place I have been in so much pain in my right eye for the past five years in right eye and temperal area unbearable I just went to another doctor and found out I never had glaucoma and do not have it now why would the people that you trusted the most have put doubt in my mind with all doctors such a shame, these are my eyes you ruined (greedy monster)

⭐☆☆☆☆ Warning: Dangerous doctor

Self-verified patient of Dr. Nossonal Kleinfeldt - Posted on March 8th, 2018

Four Years ago I was diagnosed by Dr. Kleinfeldt with Glaucoma, went thru years of costly appointments and medications. Was prescribed drops to contain my Glaucoma. The Doctor actually wanted to perform Surgery on me. That is when I decided to get a second opinion only to find out "I did not have" Glaucoma... I hold Dr. Kleinfeldt responsible for any future problems that I may encounter. Not sure why the State lets this quack even practice. He is solely into this field to make money. He is so far from the Oath that he took as from all the comments, it's obvious that he does not care about his patients. I am planning to file a complaint with the State as this doctor has no business in the medical field.

⭐☆☆☆☆ Kleinfeldt is a quack!

Self-verified patient of Dr. Nossonal Kleinfeldt - Posted on January 19th, 2017

After undergoing testing for glaucoma at the Dearborn office, I awaited my results, but Kleinfeldt never cared or could be bothered to share results before handing me a bottle of drops and saying it was a good thing I was sent to him, and quickly exiting before answering any questions or concerns. I went to another doctor who shared all test results and informed me I DID NOT have glaucoma! I wonder how many others were misdiagnosed by this so-called dr. Getting an appointment was easy, but I realize now this place is just a money making machine!

Show Rating Breakdown ⌄

⭐☆☆☆☆ An impersonal high volume medical practice
Self-verified patient of Dr. Nossonal Kleinfeldt - Posted on January 12th, 2016

Dr. Kleinfeldt performed cataract surgery on both eyes. I had no cataract problem with one eye but he recommended it. Foolishly I agreed and wouldn't you know it I had a problem with that surgery. The first time I saw him I mentioned it and he just ignored me and walked out! The second time he passed it off as nothing. The third time he recommended laser treatment. He probably spent no more than 2 minutes wit me each time. The problem, though not serious, never went away and I am now preparing to see another doctor. He shows no interest in your concerns. Stay away.

Show Rating Breakdown ⌄

⭐☆☆☆☆ Worst Experience with a medical office
Self-verified patient of Dr. Nossonal Kleinfeldt - Posted on October 24th, 2013

This was truly the worst experience I have had at a physician's office, I took my elderly mother to see Dr. Kleinfelt to determine in she needed surgery for cataracts. There had to be close to 50 people in the waiting room when we got there and we were there for 4 HOURS. In this four hour wait, we spent all of 90 seconds with the Doctor. Of course after the 90 second exam Dr. Klienfelt said she "needed surgery" and it was scheduled. I was very disgusted by the experience and so I then took her to another Doctor and was told she did not need to surgery, Clearly it is an volume business model, but at what risk to one's eyes?

Show Rating Breakdown ⌄

160. The fact that so many patients did not actually display symptoms of POAG explains how Dr. Kleinfeldt was able to perform so many procedures in a single day – the patients did not actually need the service, and thus Dr. Kleinfeldt was able to rush through the procedure, going through the motions rather than actually performing the delicate and precise service for which he charged Medicare, Medicaid, Tricare, and other insurers.

161. Claims data from CMS further supports the notion that Dr. Kleinfeldt has systematically performed and billed for numerous medically unnecessary

procedures for the treatment of POAG, in addition to billing for services that he either never performed, or that were substantially upcoded.

162. Dr. Kleinfeldt uses three procedures for the treatment of POAG, SLT (HCPCS 65855), TSCPC (HCPCS 66710), and ECP (HCPCS 66711).

163. SLT involves using a laser to increase the flow of aqueous humor by changing trabecular meshwork (fluid drainage system) structure to allow better outflow.

164. TSCPC and ECP procedures involve using laser to decrease aqueous humor production by directly ablating tissue inside the ciliary body where aqueous humor fluid is produced.

165. In 2016, Medicare paid Dr. Kleinfeldt an average of $223.14, $357.77, and $553.41, respectively, for SLT, TSCPC, and ECP. Note, these rates are the weighted averages of procedures which Dr. Kleinfeldt billed as both facility and non-facility procedures.

166. As the owner of OSM's outpatient surgical center, Dr. Kleinfeldt performed his procedures in the surgical center whenever possible, so as to permit him and OSM to collect both the provider's professional fee and facility fees as an Ambulatory Surgical Center.

167. Dr. Kleinfeldt often expressed to Relator a preference for the use of ECP to treat POAG, likely because it affords the highest reimbursement from Medicare.

168. In 2017 and 2018, Relator noticed that Dr. Kleinfeldt performed an increasing volume of ECP and TSCPC procedures.  CMS has not published data for these years.

169. In 2016, 17,788 ophthalmologists submitted claims to Medicare nationwide, yet only 225 of those providers submitted claims for ECP, as it is not a preferred treatment for glaucoma, and generally not medically necessary.

170. In 2016, Dr. Kleinfeldt billed for 182 ECP procedures, earning an average of $553.71 per service, or approximately $100,775.

171. Only one ophthalmologist in the country billed Medicare for more ECP procedures than Dr. Kleinfeldt in 2016, and that individual billed the procedures as office visits with an average claim amount of $44.42 and average payment of $8.17 per procedure.

172. By comparison, Stephen Verb, M.D. ("Dr. Verb"), another ophthalmologist at OSM who draws from the identical patient population billed Medicare for only 33 ECP procedures in 2016.  Again, this is because ECP is not a primary or preferred method of treatment for POAG, and it is generally not medically necessary.

173. The claims data from other well-known regional ophthalmologists who also specialize in cataracts like Dr. Kleinfeldt also demonstrates that Dr. Kleinfeldt is an extreme outlier in his widespread use of ECP.

174. Cataract specialist Stephen Shanbom, M.D. ("Dr. Shanbom"), practices only about three miles from OSM's Livonia surgical center and draws from the identical patient population and targets the same referrals.

175. In 2016, Dr. Shanbom saw 1,131 Medicare beneficiaries. He billed Medicare for only 20 ECP procedures, about 11 percent of Dr. Kleinfeldt's astounding 182 ECP procedures.

176. Cataract specialist Paul Ernest, M.D., ("Dr. Ernest"), who practices about 70 miles away from OSM's Livonia surgical center, saw 1,061 Medicare beneficiaries in 2016. He did not bill Medicare for a single ECP procedure in 2016.

177. Even more telling of the fact that Dr. Kleinfeldt is systematically performing unnecessary procedures for the treatment of glaucoma is a comparison with local ophthalmologists specializing in the treatment of glaucoma.

178. As glaucoma specialists, these doctors are likely to encounter far more severe and advanced cases of glaucoma, which are more likely to justify the more frequent use of ECP.

35

179. Drs. Les and Marc Siegel, who founded the Glaucoma Center of Michigan, with three locations as close as one mile from an OSM office, billed Medicare for only 75 and 79 ECP procedures, respectively, in 2016. Dr. Kleinfeldt, a cataract specialist, billed for more ECP procedures than both of these glaucoma specialists combined.

180. Across Michigan, only 19 other ophthalmologists submitted claims to Medicare for ECP in 2016.  These other ophthalmologists submitted claims for a median number of 30.5 ECP procedures, and the highest volume biller submitted less than half as many ECP claims as Dr. Kleinfeldt, with 79 claims compared to Dr. Kleinfeldt's 182 claims.

181. The claims data from CMS strongly suggests that Dr. Kleinfeldt is performing far more ECP procedures than is medically necessary.

182. Medicare claims data from other years also shows that Dr. Kleinfeldt is a statistical outlier when compared to the 17,000 plus ophthalmologists submitting claims to Medicare annually, and supports the notion that he has been performing medically unnecessary procedures for many years.

| YEAR | NUMBER OF DOCTORS SUBMITTING MEDICARE CLAIMS FOR ECP NATIONALLY | MEDIAN NUMBER OF ECP PROCEDURES BILLED NATIONALLY | NUMBER OF ECP PROCEDURES BILLED TO MEDICARE BY DR. KLEINFELDT | DR. KLEINFELDT'S NATIONAL RANK AMONG ECP PROVIDERS |
|---|---|---|---|---|
| 2016 | 225 | 26 | 182 | 2ND |
| 2015 | 225 | 26 | 220 | 1ST |
| 2014 | 212 | 27 | 166 | 3RD |
| 2013 | 209 | 28 | 210 | 1ST |
| 2012 | 242 | 25.5 | 263 | 1ST |

183. The claims data for SLT is similar to that for ECP, and again paints Dr. Kleinfeldt as a national outlier.

184. In the two most recent years of Medicare claims data published by CMS, 2016 and 2015, Dr. Kleinfeldt was ranked 9TH and 5TH for the most SLT procedures billed to Medicare.

185. In 2016, Dr. Kleinfeldt submitted claims to Medicare for 381 SLT procedures, and in 2015, he submitted claims for 409 SLT procedures.

186. The claims data from CMS strongly supports Relator's allegation that Dr. Kleinfeldt has performed and billed government healthcare programs for countless unnecessary medical procedures performed on patients that he intentionally falsely diagnosed as having POAG.

## <u>CONCLUSION</u>

187. In summary, OSM and Dr. Kleinfeldt are engaged in a systematic pattern and practice of fraud in the form of paying unlawful kickbacks for

referrals, billing for services that he never performed or intentionally billed improperly, and lastly, altering medical records and falsely diagnosing patients with POAG and performing countless unnecessary laser correction procedures.

188. OSM and its employees, at the direction of Dr. Kleinfeldt, pay optometrists for referrals with several hundreds of dollars' worth of gift cards each year.

189. Optometrists, named as Jane Doe Defendants in this action, make referrals to OSM as a result of the payments provided by OSM.

190. Dr. Kleinfeldt and OSM also enter into straw co-management arrangements with John and Jane Doe Defendants, which function as a greater than $100 per procedure referral fee.

191. Dr. Kleinfeldt routinely fails to perform or properly perform basic parts of eye exams that he bills to Medicare, Medicaid, and Tricare.  He spends an average of three minutes or less per patient, and yet bills for hundreds of services that by definition take 15 to 45 minutes to perform.

192. Dr. Kleinfeldt falsifies IOP measurements in order to misdiagnose patients with POAG and to justify performing thousands of medically unnecessary procedures, for which he bills Medicare, Medicaid, and Tricare.

193. Dr. Kleinfeldt, as an officer and owner of OSM, was aware that he and OSM received overpayments from Medicare, Medicaid, and Tricare and yet he and OSM failed to take any remedial action.

194. The CEO of OSM, under the direction and control of the Ridgemont Defendants, which own a controlling interest in OSM, became aware of at least part of the fraud orchestrated and carried out by Dr. Kleinfeldt and conducted an investigation into Dr. Kleinfeldt's practices which yielded evidence of thousands of instances of fraud.

195. Months after being put on notice of the fraud and resulting overpayments, OSM and the Ridgemont Defendants have not reported the resulting overpayments to CMS nor made any attempt to refund the payments as required by federal law and CMS regulations.

196. Through these actions, Defendants have fraudulently obtained and retained Medicaid, Medicare, and Tricare payments to which they are not entitled.

## COUNT I
## Violation of 31 U.S.C. §3729(a)(1)(A)

197. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

198. In performing the acts described above, OSM and Dr. Kleinfeldt, through their own acts or through the acts of their officers, knowingly and/or

recklessly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

199. Specifically, OSM and Dr. Kleinfeldt submitted claims for payment to the Medicare, Medicaid, and Tricare programs for services that were not medically necessary; deviated substantially from the quality of care; were worthless; not billed as provided or upcoded; or not even provided at all.

200. The United States and contractors on its behalf, unaware of the foregoing circumstances and conduct of OSM and Dr. Kleinfeldt, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT II
## Violation of 31 U.S.C. §3729(a)(1)(B)

201. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

202. In performing the acts described above, Defendants, through their own acts or through the acts of their officers, knowingly and/or recklessly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729(a)(1)(B).

203. OSM, Dr. Kleinfeldt, and John and Jane Does 1-100 falsely certified compliance with numerous federal laws and regulations relating to the participation in federal healthcare programs and the processing of claims, including those pertaining to medical necessity, following applicable standards of

care, billing only for services rendered completely, and compliance with the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn, prohibiting referrals to entities with which a physician has a financial relationship.

204. The false certifications were made on CMS Forms 1500, 855b, and 855i, among others, and they were submitted on various occasions ranging from the providers enrollment and renewal in federal healthcare programs, and with the submission of each individual claim submitted to Medicare, Medicaid, and Tricare.

205. Specifically, a majority of claims submitted by Dr. Kleinfeldt or his agents for HCPCS codes 65855, 66711, 66710, 99203, 99204, 99213, and 99215 were for services that either were not medically necessary, not actually performed, upcoded, or otherwise not performed as described.

206. The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT III
## Violation of 31 U.S.C. §3729(a)(1)(G)

207. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

208. In performing the acts above, OSM, Dr. Kleinfeldt, and the Ridgemont Defendants knowingly and/or recklessly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, and knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money to the government.

209. Specifically, OSM, Dr. Kleinfeldt, and the Ridgemont Defendants were on notice that they received fraudulently obtained overpayments from federal healthcare programs as a result of Dr. Kleinfeldt's position in the organization as an officer and owner, and his role as the architect and perpetrator of the fraud.

210. Additionally, OSM, Dr. Kleinfeldt, and the Ridgemont Defendants were on notice that they received fraudulently obtained overpayments from federal healthcare programs when they were informed by two OSM employees that Dr. Kleinfeldt was systematically falsifying medical records and intentionally misdiagnosing patients in order to justify performing medically unnecessary procedures.

211. Upon notification of the fraud by the employees, OSM's CEO, an agent of the Ridgemont Defendants under their exclusive control, conducted an internal audit which identified approximately 20,000 falsified medical records.

212. Defendants unlawfully retained and failed to return the overpayments they received as a result of the false and fraudulent billings submitted to Medicare, Medicaid, and Tricare, and failed to comply with the "60-day rule" imposed by the Patient Protection and Affordable Care Act.

213. Accordingly, the United States has been deprived of the use of such monies and has been damaged in an amount to be determined.

## COUNT IV
### Violation of 31 U.S.C. §3729(a)(1)(C)

214. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

215. In performing the acts above, Defendants conspired to commit a violation of 31 U.S.C. §3729 subparagraph (A), (B) and (G).

## COUNT V
### Violation of M.C.L. §400.607(1)

216. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

217. In performing the acts described above, Defendants, through their own actions or through the acts of their officers, knowingly presented, or caused to be presented, to an officer or employee of the State of Michigan, a false claim under the Social Welfare Act in violation of M.C.L. §400.607(1).

218. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT VI
## Violation of M.C.L. §400.607(2)

219. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

220. In performing the acts described above, Defendants, through their own actions or through the acts of their officers, knowingly presented, or caused to be presented a claim under the social welfare act which Defendants knew falsely represented that the goods or services for which the claim was made were medically necessary and in accordance with professionally accepted standards.

221. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT VII
## Violation of M.C.L. §400.607(3)

222. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

223. In performing the acts described above, Defendants, through their own actions or through the acts of their officers and/or agents, knowingly made, used, or caused to be made or used a false record of statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the Social Welfare Act.

224. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT VIII
## Violation of MCL §400.606

225. Relator realleges and incorporates paragraphs 1-196 of this Complaint as if fully set forth herein.

226. In performing the acts described above, Defendants, through their own acts or through the acts of their officers and/or agents, entered into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act.

227. The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator respectfully request that this Court enter judgment against Defendants as follows:

a.　That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. §3729 *et seq*. provides;

b.　That civil penalties in accordance with the False Claims Act be imposed for each and every false claim that the Defendants caused to be presented to the United States and state of Michigan;

c.　That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing this case;

d.　That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e.　That the State of Michigan be awarded damages in the amount of three times the damages sustained by the State of Michigan because of the false claims alleged in this complaint, as the Michigan Medicaid False Claims Act, M.C.L. §400.612, provides;

f.  That civil monetary penalties of $50,000 be imposed against each Defendant for violation of M.C.L. §400.607;

g.  That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Michigan Medicaid False Claims Act;

h.  That Relator be awarded the maximum amount allowed pursuant to the Michigan Medicaid False Claims Act, and;

i.  That this Court award such other and further relief as it deems proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Relator demands a jury trial on all claims alleged herein.

May 16, 2019

Respectfully submitted,

James Hoyer, P.A.

/s/

David L. Haron (P14655)
30300 Northwestern Highway
Suite 115
Farmington Hills, MI 48334
(248) 539-7420

David L. Scher (admitted EDMI)
1300 I Street N.W.
Suite 400E
Washington, D.C. 20005
(202) 975-4944

dharon@jameshoyer.com
dscher@jameshoyer.com

Attorneys for Relator

47